IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **GUY E. LANTER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil No. 13-cv-827-SMY-CJP** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Guy E. Lanter seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB in April, 2010, alleging disability beginning on September 4, 2008.   The alleged date of onset is the date on which plaintiff's previous application for disability benefits had been denied. (Tr. 19).   After holding an evidentiary hearing, ALJ Joseph W. Warzycki denied the application in a written decision dated April 13, 2012.  (Tr. 19-28).   The Appeals Council denied review, and the decision of the ALJ became the final agency decision.   (Tr. 1).   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

1

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1.      The ALJ erred in improperly evaluating the medial evidence and in failing to include all limitations supported by the evidence in his assessment of plaintiff's residual functional capacity.

2.      The ALJ failed to properly evaluate plaintiff's credibility.

**Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

With regard to plaintiff's application for DIB, plaintiff must establish that he was

---

[1]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

disabled as of his date last insured.   *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th   Cir.

1997).    It is not sufficient to show that the impairment was present as of the date last

insured; rather plaintiff must show that the impairment was severe enough to be

disabling as of the relevant date.   *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to determine

whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained

this process as follows:

> The first step considers whether the applicant is engaging in substantial
> gainful activity. The second step evaluates whether an alleged physical or
> mental impairment is severe, medically determinable, and meets a
> durational requirement. The third step compares the impairment to a list of
> impairments that are considered conclusively disabling. If the impairment
> meets or equals one of the listed impairments, then the applicant is
> considered disabled; if the impairment does not meet or equal a listed
> impairment, then the evaluation continues. The fourth step assesses an
> applicant's residual functional capacity (RFC) and ability to engage in past
> relevant work. If an applicant can engage in past relevant work, he is not
> disabled. The fifth step assesses the applicant's RFC, as well as his age,
> education, and work experience to determine whether the applicant can
> engage in other work. If the applicant can engage in other work, he is not
> disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently

unemployed; (2) whether the claimant has an impairment or combination of

impairments that is serious; (3) whether the impairments meet or equal one of the listed

impairments acknowledged to be conclusively disabling; (4) whether the claimant can

perform past relevant work; and (5) whether the claimant is capable of performing any

work within the economy, given his or her age, education and work experience.   20

C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Lanter was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence,"

the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Warzycki followed the five-step analytical framework described above.   He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date.   The ALJ found that plaintiff had severe impairments of residuals of status post remote right above the knee amputation, surgically repaired fractures of the left pelvis and left ulna, and degenerative disc disease of the lumbar spine   He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Lanter had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work.   He was, however, not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1. Agency Forms

Plaintiff was born in 1959, and was 49 years old on the alleged onset date of September 4, 2008. (Tr. 173). He was insured for DIB through December 31, 2011. (Tr. 173).

In June, 2010, plaintiff filed an Activities of Daily Living Report in which he said he lived alone. He prepared his own simple meals and drove a car. He shopped for groceries. His son did the house and yard work. He said he had difficulties with activities such as lifting, squatting, bending, walking and sitting. His medications affected his memory and concentration. He had been using an artificial limb, cane, crutches and wheelchair since 1998. (Tr. 176-187).

In a later report, plaintiff said that his depression was getting worse. He was having more pain and breakdown of the skin on his stump. (Tr. 208).

### 2. Evidentiary Hearing

Mr. Lanter was represented by an attorney at the evidentiary hearing in February, 2012. (Tr. 35).

Dr. Robert Thompson, an orthopedic surgeon, testified as a medical expert. He did not examine plaintiff, but testified based on a review of the medical records. He testified that Ms. Lanter had an above the knee amputation of the right leg, with no medical disorder remaining in the bony stump or soft tissue covering that needed to be addressed surgically. The records contained only one visit for skin problems on the stump. That was a visit for cellulitis in January, 2007. In July, 2010, a record noted "voluntary use of two crutches." He had a prior left sacral surgery with placement of

6

two screws.   He had mild L3-4 degenerative disc disease and spondylosis.   The range of motion of the left hip was decreased by about ten degrees.   His impairments did not meet or equal a Listing.   (Tr. 36-38).

Dr. Thompson testified that plaintiff had the RFC to do light work with some postural and environmental limitations.   (Tr. 39-40).

On cross-examination, Dr. Thompson testified that, if wearing his prosthesis caused sores on his stump, Mr. Lanter should have the prosthesis adjusted.   The doctor had run an amputation clinic for almost twenty years, and, in his experience, a prosthesis can always be adjusted so that the patient can wear it.   (Tr. 40-41).

Mr. Lanter testified that he lost his leg in a car accident.   He worked from 1996 to 2005 as a press operator.   He was fired in 2005 because he got in trouble with drugs. He had some income in 2008 from selling timber off some land that he owned. He graduated from high school.   (Tr. 45-48).

At the time of her hearing, he was 52 years old.   He was living with his girlfriend. He had a twenty-two year old son.   He had no income and no health insurance.   (Tr. 42-44).   He testified that he did not do much during the day.   His girlfriend did the housework, laundry, cooking and shopping.   (Tr. 49-50).   He was in prison for nine months for cocaine possession.   (Tr. 53-54).

Mr. Lanter was taking hydrocodone for pain in his back and hip.   He stopped using his prosthetic because it rubbed his stump raw.   He also had a steel plate in his arm from the car accident.   He could use his arm, but it did not have full strength.   His left shoulder was "popped out" in the accident, and caused him pain.   His

7

concentration "floats in and out."   He was depressed.   (Tr. 55-59).

Plaintiff said he could sit in a chair, and was able to stand up for five or ten minutes.   With crutches, he could walk for about a block.   He had been using a wheelchair since November or December, 2010.   (Tr. 59-61).

Lastly, a vocational expert (VE) testified that plaintiff's past work was performed at the medium exertional level.   The ALJ asked him a hypothetical question incorporating the limitations previously testified to by the medical expert, that is, a person who was able to do work at the light exertional level, including sitting, standing and walking for six hours a day, limited to only occasional climbing of ramps and stairs, balancing and stooping, and no kneeling, crouching, crawling or climbing of ladders, ropes or scaffolds.   This person could not operate foot controls with the right leg, and should have no exposure to unprotected heights or dangerous machinery.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which he could do.   Examples of such jobs are parking lot attendant, assembler in the lighting industry, and assembler in the computer industry. If he were to miss more than two days a month or require additional breaks throughout the day, competitive employment would be precluded.   (Tr. 63-66).

### 3.    Medical Treatment

The records of primary care physician Paul Reger indicate that Mr. Lanter's accident occurred in February, 1998.   (Tr. 225).   Dr. Reger saw him for cellulitis of the right stump in January, 2007.   The doctor advised him to follow-up with the "prosthetic people."   (Tr. 245).

In February, 2008, x-rays of the lumbosacral spine showed metallic fixation of the left superior sacrum, spina bifida occulta of L5, mild degenerative disc disease at L3-4, and spondylosis.[2] (Tr. 289). Plaintiff was then seen by a pain management specialist at Memorial Hospital for complaints of pain in his low back and both hips. This doctor noted that bilateral shoulder range of motion was normal, and his lumbar range of motion was moderately decreased for flexion and extension. He had tenderness at L3-4 through L5-S1 and tenderness in the bilateral sacroiliac joint. The doctor administered epidural steroid injections which gave plaintiff some temporary relief. In March, 2008, the doctor noted that plaintiff was working part-time as a motorcycle repairer. (Tr. 226). In July, 2008, it was noted that plaintiff was walking better with a new prosthesis. (Tr. 292- 298).

In November, 2008, Mr. Lanter called Dr. Reger's office to request a prescription for Prednisone. He said that he had a rash because he had "been outside around timber." (Tr. 247).

The only treatment in 2009 was three visits to Dr. Reger. (Tr. 233). In May, 2009, Dr. Reger noted that plaintiff had not been seen for some time because he lost his insurance, but now he was "back on Medicaid." Dr. Reger treated him for high blood pressure and cholesterol. (Tr. 247).

Mr. Lanter began seeing Dr. Mark Day at Vandalia Health Center as his primary care physician in April, 2010. Dr. Day reviewed his history and noted that he had been

---

[2] Spina bifida occulta is "a mild often asymptomatic form of spina bifida in which there is no hernial protrusion of the meninges or spinal cord." http://www.merriam-webster.com/medical/ spina%20bifida%20occulta, accessed on November 13, 2014.

hit by a car in 1998, resulting in above the knee amputation on the right and fracture of his right arm.   His arm was repaired with a steel plate.   Plaintiff said that he had chronic back pain and was "working on disability." Dr. Day prescribed Tramadol.   (Tr. 304).   In May, 2010, plaintiff reported that Tramadol caused excessive sweating.   Dr. Day switched him to Lyrica, Prednisone taper and Vicodin.   He was still waiting to receive the records from pain management.   (Tr. 302).   In June, 2010, Dr. Day noted that his medications helped his pain.   (Tr. 310).

Dr. Vittal Chapa performed a consultative physical examination on July 3, 2010. Mr. Lanter told Dr. Chapa that the liner in his prosthesis was worn out, and he got sores on his stump when he wore it.   He used it only to walk short distances.   He could walk 200 to 300 feet with it.   He had his crutches with him on the day of the exam.   Dr. Chapa found that he had full strength in both arms and in his left leg.   Sensation was intact in both arms and in his left leg.   His stump looked healthy with no redness, drainage or inflammation.   He had no paravertebral muscle spasm.   Straight leg raising was negative on both sides.   Range of motion of the lumbosacral spine was limited.   He had a limited range of motion of the left hip.   He was able to perform fine and gross manipulations with both hands, and his handgrip was full and equal.   Dr. Chapa found no definite evidence of lumbar radiculopathy, and stated that his back pain was "probably related to left hip pinning and the amputation of the right leg."   An x-ray showed mild degenerative disc disease at L3-4 and L4-5.   (Tr. 312-319).

In August, 2010, another doctor at Vandalia Health Center noted that plaintiff had fallen backwards a few days earlier, and had "quite a bit" of low back pain.   However,

his friend "snapped his back" and his pain was almost completely gone.   He was able to walk and bend his back without problems.   (Tr. 308).   In November, 2010, plaintiff saw another doctor in the same office for low back pain shooting into his hips.   The doctor found tenderness in the low back and prescribed Vicodin.   (Tr. 391).

The record contains medical records from the Missouri Department of Corrections for the period from April 28, 2011, to January 24, 2012.   (Tr. 331-385). Crutches were issued to plaintiff on April 28, 2011.   (Tr. 381).   He was prescribed medication for acid reflux and high blood pressure on the first visit.   (Tr. 385).   His extremities were strong and his grip strength was equal.   He said that he had last used cocaine three years earlier.     (Tr. 377).   In June, 2011, plaintiff was transferred to another prison.   He complained of pain in the hips and low back from being in his wheelchair so much.   He asked for crutches.   He noted that he had a prosthetic, but it was old and did not fit right, so he usually used crutches.   He wanted to be given his own aluminum crutches, rather than the prison-issued wooden ones.   (Tr. 356-358). In July, 2011, plaintiff told a doctor that he had chronic low back pain.   He said he had a prosthetic at home but did not use it because it was coming apart.   (Tr. 355).   In November, 2011, plaintiff told a nurse that he used a prosthetic limb before he went to prison, but it was damaged, and he hoped to get a new one after he got out of prison and on Medicaid.   He used crutches in prison.   His stump had no lesions or pressure areas. (Tr. 344).   On another visit in November, 2011, he said he had stopped using the prosthetic because of irritation.   (Tr. 337).

Plaintiff was seen again at Vandalia Health Center after his release from prison in

11

February, 2012.  He complained of pain in his left forearm, leg and back.  Physical exam was normal except for tenderness in the back from L4-S1. (Tr. 387).   The last note is dated March 22, 2012.   He was seen for follow-up of hypertension.   Physical exam showed no findings regarding his back.   (Tr. 388).

     **4.**     **Opinions of Treating Doctor**

     The record does not include an opinion from a treating doctor.

<u>**Analysis**</u>

     Plaintiff first argues that the ALJ erred in assessing his RFC because he should have included additional limitations that are supported by his testimony and by the medical records.   Many of the medical records he cites are notations of his subjective complaints.   As his argument relies heavily on the credibility of his own statements, the Court will first consider his argument regarding the ALJ's credibility analysis.

     It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).   "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case."   *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

     SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR

12

96-7p, at *3.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff has not advanced a convincing challenge to the credibility determination. The gist of his argument is that the ALJ did not make sufficiently specific credibility findings.   This Court disagrees.

The ALJ is required to give "specific reasons" for his credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony.   *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).   See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")   The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration."   *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies.   *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Plaintiff's argument is short on specifics and ignores the fact that ALJ Warzycki gave specific reasons for his conclusion that plaintiff's allegations were not credible.   He explained that the objective medical evidence did not support his claim of disabling

symptoms.   He noted that plaintiff had only conservative treatment and the medical records reflect only mild tenderness in the lumbosacral area with mildly decreased range of motion and no radiculopathy.   The medical records reflect that he had full muscle and grip strength in both upper extremities.   The ALJ found that his credibility was diminished by the fact that he had been able to work for years after his amputation and surgery to repair his hip and arm.   The testimony that he gave at the hearing conflicted with statements made in his written Activities of Daily Living Report.   He did not appear to be in discomfort at the hearing.   And, none of his doctors placed any long-term restrictions on his activities.   (Tr. 24-25).

It is clear that the ALJ considered the relevant factors.   Plaintiff suggests that the ALJ erred in failing to consider that he had no insurance and no income at the time of the hearing.   However, the record reflects that Mr. Lanter had Medicaid coverage as of May, 2009.   (Tr. 247).   He was obviously able to access medical care while in prison, and he was also able to obtain care at Vandalia Health Center before and after his incarceration.   Therefore, the record does not support his argument that he was unable to obtain care due to lack of resources.

Plaintiff also argues that the ALJ erred in considering his appearance at the hearing.   However, "a fact finder can use observation to assist in making credibility determinations."   *Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan,* 687 F.3d 320, 336 (7th Cir. 2012), citing *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000).

Plaintiff takes issue with the ALJ's conclusion that his medications had little significant side effects, citing a complaint he made about side effects in January, 2008.

14

That note predates the alleged onset of disability by about nine months, and is not persuasive.   He argues that the ALJ should have examined his claim that his medications made him feel drowsy and spaced out, but he cites no evidence to support that claim.

Notably, the ALJ did not use the boilerplate language that was at issue in *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011), and *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003). Therefore, plaintiff's citation of those cases is inapposite.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."   *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).   The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support."   *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008).   Here, the analysis is far from patently wrong.   Generally, an ALJ's credibility analysis will be upheld "if the ALJ provided specific reasons for discrediting the claimant's testimony." *Ronning v. Colvin*, 555 Fed.Appx. 619, 623 (7th Cir. 2014).   Here, the ALJ gave specific reasons.   It is evident that ALJ Warzycki considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony.   *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).   Therefore, his credibility determination stands.

Plaintiff's only other point can be swiftly disposed of.   He argues that the assessment of his RFC was the product of an improper assessment of the medical evidence.

RFC is "the most you can still do despite your limitations."   20 C.F.R. §1545(a).

In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Ibid.* Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

With regard to the medical records, plaintiff cites mostly to notes recording his subjective complaints. For the reasons set forth above, the ALJ was not required to credit these subjective complaints, and his analysis of plaintiff's credibility is not erroneous.

Plaintiff's argument is doomed by the fact that the ALJ relied upon the testimony of a medical expert, Dr. Thompson, in assessing his RFC. Dr. Thompson is an orthopedic surgeon with expertise in treating people who have amputations. As a consulting physician, he had "the advantages of both impartiality and expertise." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Plaintiff argues that Dr. Thompson was testifying only about the effects of plaintiff's amputation, and not the totality of his impairments, but this ignores the plain language of Dr. Thompson's testimony. In addition, plaintiff was represented by counsel at the hearing who had an opportunity to question Dr. Thompson. "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987).

In the final analysis, plaintiff's arguments are a plea to the Court to reweigh the evidence, which is far beyond this Court's proper role. The most that can be said is that

reasonable minds could differ as to whether Mr. Lanter was disabled during the relevant time period.   In that circumstance, the ALJ's decision must be affirmed if it is supported by substantial evidence.   And, the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Warzycki committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Guy E. Lanter's application for disability benefits is **AFFIRMED**.

The Clerk of Court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   November 19, 2014**

**/s/ Staci M. Yandle**
**STACI M. YANDLE**
**DISTRICT JUDGE**